# Exhibit 3

1

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


LaMECIA McKENZIE, individually,
and on behalf of all others
similarly situated,

        Plaintiffs,

        vs.                          CASE NO. CV10-02420 GAF

FEDERAL EXPRESS CORPORATION,
and Does 1 through 50, inclusive,

        Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~



VIDEOTAPED DEPOSITION OF

LaMECIA McKENZIE



January 25, 2011

12:52 p.m.


2601 Main Street, Suite 340

Irvine, California



Linda M. Unger, CSR No. 11403



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

LaMECIA McKENZIE                                          January 25, 2011

                                                                      10

1      A    Divorced.

2      Q    Okay.  Any children?

3      A    No.

4      Q    How long have you been divorced?

5           MR. HANSON:  I'm going to object.  I think

6     we're getting into her right of privacy here.  Unless,

7     Counsel, you can give me a reason why you need that

8     information, I'll let her answer.

9           But, otherwise, don't answer that question.

10    BY MR. BABCOCK:

11     Q    Ms McKenzie, can you summarize for me the

12    places you've lived in your life?

13     A    Yes.  I currently live in Pasadena.  I lived

14    in Los Angeles for a little bit and the San Fernando

15    Valley.

16     Q    You were born in L.A.

17          Did you grow up in L.A. then?

18     A    In Inglewood, yes.

19     Q    Okay.  And how long have you lived in

20    Pasadena?

21     A    Under a year.

22     Q    Okay.  Before that, you lived in L.A.?

23     A    Yes.

24     Q    All right.  And some other time while you

25    were an adult, you lived in San Fernando?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

LaMECIA McKENZIE                                    January 25, 2011

11

1        A    Yeah.

2        Q    Okay.

3        A    That's where I went to college.

4        Q    I'm sorry?

5        A    That's where I went to college.

6        Q    What was the name of the college?

7        A    California State University of Northridge.

8        Q    Do you currently live alone?

9        A    Yes.

10        Q    Ms. McKenzie, where did you go to high

11    school?

12        A    Inglewood High School.

13        Q    You obviously graduated since you went to

14    college; right?

15        A    Uh-huh.

16        Q    Were you a good student in high school?

17        A    Yeah, I was.

18        Q    What's your definition of good?  Do you

19    remember your grade point?

20        A    My grade point in high school was a 3.3 --

21    something around there.

22        Q    It's better than mine.

23             How long did you attend college at the

24    California State University at Northridge?

25        A    Two years at Northridge and a year at Pierce



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

LaMECIA McKENZIE                                      January 25, 2011

                                                                    12

1    College.

2         Q    Where's Pierce College?

3         A    It's also in the San Fernando Valley.  It's

4    in Woodland Hills, California.

5         Q    Okay.  And did you go to college right after

6    high school?

7         A    Yes.

8         Q    All right.  And did you go to college for

9    three consecutive years?

10        A    No.  I went one year on and one year at CSUN.

11        Q    Okay.

12        A    At CSUN, California State University of

13   Northridge.

14        Q    Okay.  And then when did you attend Pierce

15   College?

16        A    A year after my second stint at CSUN.

17        Q    Did you declare a major when you were in

18   college?

19        A    Uh-huh, psychology.

20        Q    Did you receive a college degree?

21        A    No.

22        Q    Do you recall how many college credits you

23   took?

24        A    I had enough to get an AA.

25        Q    Your associates degree?


ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1      A    Yeah.

2      Q    Okay.  Is that in anything in particular?

3      A    Arts.

4      Q    Arts.

5      A    Yeah.

6      Q    All right.  I saw on your application you

7   listed computer science as an area of interest?

8      A    That was when I was in my very -- we had to

9   claim a major before you went to college.  I claimed

10  computer science, and once I got into school, I

11  switched it to psychology.

12     Q    Okay.  How soon after you started college did

13  you switch to the psychology degree?

14     A    Before the second semester.

15     Q    Okay.

16     A    So I pretty much knew once I got -- had a

17  couple of those computer science classes that that

18  wasn't for me.

19     Q    Not for you?

20     A    Uh-uh.

21     Q    All right.  Did you take any math courses in

22  college?

23     A    Oh, yeah, I did.  I took the bare minimum.

24  Yeah, the bare minimum, like the required classes.

25     Q    Did you make good grades in your college



ESQUIRE
an Alexander Gallo Company

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

LaMECIA McKENZIE                                    January 25, 2011

14

1    coursework?

2         A    Except for the math classes, yeah.

3         Q    Okay.  What kind of grades did you get in the

4    courses besides math?

5         A    Let's see.  I made the dean's list the first

6    semester, first and second semester, so I did pretty

7    good.  Mainly A's and B's.

8         Q    Okay.  And what did you get in the math

9    class?

10        A    Oh, C's, low C's.

11        Q    Okay.

12        A    Uh-huh.

13        Q    Did you have -- you said you had to take the

14   bare minimums?

15        A    Once I changed majors, then there were only a

16   couple of math classes that were requirements to get

17   your degree, so those were the ones that I took.

18        Q    Perfect.  Have you ever served in the

19   military, ma'am?

20        A    No.

21        Q    I'll show you what's -- will be marked as

22   Exhibit 1.

23             (Exhibit 1 marked)

24             MR. BABCOCK:  Sorry, Mr. Hanson.  I didn't

25   realize there were going to be two of you.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

LaMECIA McKENZIE                                    January 25, 2011

17

 1    receiving overtime pay?

 2        A    Yes.

 3        Q    Did you work any overtime?

 4        A    Uh-huh.

 5        Q    What about when you worked at Lerners?  Did

 6    you work any overtime?

 7        A    Rarely, because I was still a minor, so I

 8    couldn't work too much overtime.

 9        Q    What about currently at the Automotive Club

10    of California?

11        A    Yes.

12        Q    Do you work overtime?

13        A    Uh-huh.

14        Q    Ma'am, what's your understanding of when

15    you're entitled to overtime?  After 40 hours?

16             MR. HANSON:  Objection.  Calls for a legal

17    conclusion.

18             If she has an understanding, she can answer.

19             THE WITNESS:  Yes, I know what overtime

20    means.

21    BY MR. BABCOCK:

22        Q    Okay.  What does it mean?

23        A    Any hours worked more than -- if I'm a

24    full-time employee, 40 hours a week or eight hours in

25    a day.  If I'm a part-time employee, 30 hours,





Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

18

1  depending on what the rules are with the company, but

2  per day, if you work between -- over four to six

3  hours.

4      Q   Okay.  Is that your understanding back when

5  you worked at HMI Associates?

6      A   Yes.  Any hours I worked over my regular

7  eight hours a day was considered overtime.

8      Q   Okay.  And you would get paid more when you

9  worked overtime?

10     A   Yes, I did.

11     Q   Did you get paid time and a half?

12     A   Yes.

13     Q   You got paid time and a half for overtime at

14  HMI Associates?

15     A   Yes.

16     Q   Do you get time and a half currently when you

17  work overtime at Automotive Club?

18     A   Yes.

19     Q   You got time and a half when you worked

20  overtime at FedEx?

21     A   That's the way it's explained, yes.

22     Q   Have you heard the term "wage statement"

23  before, ma'am?

24     A   Yes.

25     Q   Okay.  That's a statement you got with your



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

LaMECIA McKENZIE                                    January 25, 2011

19

1    paycheck; is that right?

2         A    Uh-huh.

3         Q    Is that --

4         A    Well, I think it -- I'm not sure.

5         Q    What's your understanding of what a wage

6    statement is?

7         A    My paycheck stub.

8         Q    Okay.  That's a fine definition for me

9    throughout this definition -- throughout this

10   deposition.  Excuse me.

11            So did you receive wage statements when you

12   worked at HMI Associates?

13        A    Yes.

14        Q    How often were you paid at HMI Associates?

15        A    Let's see.  That was almost 20 years ago.  I

16   think it was every two weeks.

17        Q    Okay.  Do you remember what day payday was?

18        A    No.

19        Q    All right.  To test your memory, we'll go

20   back even further.  When you were at Lerners in high

21   school, did you receive wage statements --

22        A    Yes.

23        Q    -- at Lerners?

24        A    Yes.

25        Q    Do you remember how often you were paid?



ESQUIRE
an Alexander Gallo Company

LaMECIA McKENZIE                                      January 25, 2011

20

1      A    I think that was every two weeks as well.

2      Q    Okay.   What about currently at the Automotive

3    Club of California?

4      A    Every two weeks.

5      Q    Do you know when payday is at the Automotive

6    Club?

7      A    Yes, every 10th and 23rd of the month.

8      Q    Are you paid an hourly wage rate at

9    Automotive Club of California?

10     A    Yes.

11     Q    Were you paid an hourly wage rate at HMI

12   Associates?

13     A    Yes.

14     Q    Were you paid an hourly wage rate at Lerners?

15     A    Yes.

16     Q    Were you paid an hourly wage rate at FedEx?

17     A    Yes.

18     Q    Let's start with Automotive Club of

19   California.

20          Ma'am, what do you do typically when you

21   receive a paycheck from them or a wage statement?

22     A    What do I do typically?   I look at it to make

23   sure it's right.

24     Q    Okay.   So you got a wage statement two days

25   ago; right?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

LaMECIA McKENZIE                                    January 25, 2011

21

1       A    Yes.

2       Q    Today's the 25th?

3       A    Uh-huh.

4       Q    All right.  And do they come in the mail, or

5  does someone at work pass them out to you?  How's that

6  work?

7       A    The latter.  Someone at work passes it out.

8       Q    Okay.  And so two days ago.

9            How soon after you were handed your wage

10  statement did you open up the envelope?

11      A    When I received it.

12      Q    Okay.  And you looked it over?

13      A    Uh-huh.

14      Q    All right.  That's a yes?

15      A    Yes.  I'm sorry.

16      Q    We'll go backwards in time.

17           The last employer before that was FedEx?

18      A    Yes.

19      Q    What did you do when you received a wage

20  statement from FedEx?

21      A    The same, look at it.

22      Q    Okay.  Did you look at it right away?

23      A    It depends on when I received it.  If it were

24  in the morning before my shift and I had time, yes; if

25  it were in the evening after my shift, that's when I



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

LaMECIA McKENZIE                                    January 25, 2011

24

1      Q    Okay.

2      A    -- which means four days, ten hours a day.  I

3   worked my day off, part of my day off.

4          And when I got my bank statement -- my wage

5   statement the previous week for that week, I noticed

6   that it was missing some money, that they didn't pay

7   me for the full overtime.

8          I went to my manager.  I let him know that my

9   check was short.  I mean, he was, "What do you mean

10  it's short?"

11         So I showed it to him.  I said, "My hours --

12  my money at the end doesn't add up to what I think I

13  should have."

14         He said, "Well, let's see."  And so he pulled

15  it up, and he was like, "Yeah.  We didn't -- I'm

16  sorry.  We forgot to pay you for that.  We'll just put

17  it on your next week's wages."

18         And I said, "Well, how am I supposed to know

19  for sure how much I'm getting paid and how much

20  overtime I'm getting paid?"

21         And he couldn't really explain it to me well

22  enough where I could -- where I left out of the room

23  like, okay, I know what I'm looking for now.

24      Q    Okay.  Ma'am, do you remember approximately

25  when this occurred?



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

LaMECIA McKENZIE                                    January 25, 2011

25

1      A   I haven't been there in almost two years.
2   That was maybe a year prior to my dismissal.
3      Q   Okay.  Do you remember who your manager was
4   at the time?
5      A   Yes.  Gregory Arnold.
6      Q   Okay.  Let me make sure I understand this.
7      A   Okay.
8      Q   All right.  At the time -- again, it might
9   have been approximately a year before you were
10  terminated by FedEx?
11     A   Uh-huh.
12     Q   I understand you don't know the exact time?
13     A   Right.
14     Q   But whenever that was --
15     A   Uh-huh.
16     Q   -- at that time, you were scheduled to work
17  four tens?
18     A   Yes.
19     Q   What days of the week do you recall you were
20  scheduled to work?
21     A   Monday, Wednesday, Thursday, Friday.
22     Q   Okay.  And sometime during a week --
23     A   On a Tuesday.
24     Q   Okay.
25     A   I was asked to come in because they were



ESQUIRE
an Alexander Gallo Company

LaMECIA McKENZIE                                January 25, 2011

26

```
 1    short-staffed, and I worked part of my day off.
 2         Q   Okay.  Was payday at FedEx on Fridays?
 3         A   Yes, every Friday.
 4         Q   Was it Friday the whole time you worked
 5    there, from what you remember?
 6         A   Yeah.  The 18 years that I was there, yeah,
 7    it was Friday.
 8         Q   I appreciate that.
 9             Okay.  So at some point in time on a Friday,
10    you received your wage statement or your paycheck?
11         A   Uh-huh.
12         Q   Correct?
13         A   Right.
14         Q   And you looked at it to see if your hours
15    were right?
16         A   I looked at it to see how much it was.
17         Q   Okay.
18         A   And then I saw that it was short almost $200.
19    I know I worked four hours on that Tuesday prior, so
20    I'm like -- it was just missing.  So that's when I
21    went to him and when he looked back, and he said,
22    "Yes, we forgot to do that."  Because he wasn't there,
23    he said the manager that was supposed to cover for him
24    did not do it.
25             My question was, because I had worked in the
```



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

LaMECIA McKENZIE                                        January 25, 2011

28

1   Mr. Arnold, he was able to look at something and

2   determine that --

3        A    Yes.   He pulled up, I guess, the reports that

4   they run.

5        Q    Okay.

6        A    And he noticed that, yes, that I had not been

7   paid for the proper amount of hours.

8        Q    Okay.   All right.   I believe earlier on you

9   mentioned Mr. Arnold told you that you would be paid

10   for that time on your next paycheck; is that right?

11       A    Yes.   That's how it was done.

12       Q    And that did happen?

13       A    Yes, it did.

14       Q    So the next Friday, you got paid; correct?

15       A    Yes.

16       Q    And do you recall looking at your paycheck

17   that time?

18       A    Yes.

19       Q    And did you look at it to make sure that you

20   got paid --

21       A    Yes.

22       Q    -- what you thought, the extra $200 or so?

23       A    Yes.

24       Q    Again, you don't remember if it was $200

25   exactly?



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

LaMECIA McKENZIE                                    January 25, 2011

34

1    earlier?

2       A   Uh-huh.

3       Q   And you talked with your manager, Mr. Arnold?

4       A   Yes.

5       Q   And Mr. Arnold couldn't satisfactorily

6    explain some things to you; correct?

7       A   Yes.

8       Q   Is that when you went and spoke with Leslie?

9       A   Yes.

10      Q   And then Leslie referred you back to

11   Mr. Arnold?

12      A   Yes.

13      Q   Okay.  Do you remember what Mr. Arnold told

14   you or attempted to explain to you that you didn't

15   understand?

16      A   He was trying to explain to me how to add up

17   my hours as far as the regular pay and my overtime pay

18   and the hours and how they all coincided, how to get

19   to the amount at the end of the check, but it wasn't

20   -- it just didn't make any sense to me the way he was

21   explaining it.

22      Q   Do you remember what specifically he told

23   you?

24      A   No, I don't remember specifically, but I

25   remember asking him, "How much do I get paid, and how



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

35

1    much of this is overtime, and how do I calculate my

2    hours?"

3            And he kept going around and around with it

4    but never getting specifically on take A and B and

5    that's how you get to C, and that's the answer that I

6    was looking for, but he never gave it.

7        Q    Okay.  As you sit here today, ma'am, do you

8    recall any specific things you may have told

9    Mr. Arnold?

10       A    In regards to?

11       Q    That issue, your questions.  Do you recall

12   specifically what you asked him?

13       A    That's specifically what I asked him, how do

14   I get to this amount?  How do I know what is overtime?

15   How do I know what hours are being allocated to that

16   overtime?  How do I get to the end result, the number?

17           That's what I asked him to try to simplify

18   because I thought that maybe I was asking a question

19   that was too roundabout which is why I wasn't getting

20   a straightforward answer.  So I then changed it and

21   made it a straightforward question, and he still

22   couldn't answer me.

23       Q    Do you recall where this conversation took

24   place, ma'am?

25       A    In his office.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

LaMECIA McKENZIE                                     January 25, 2011

39

1       Q    Did you apply for the courier position
2   through JCATS?
3       A    Yes.
4       Q    All right.  What year do you recall
5   transferring to the CCD station?  Do you remember?
6       A    I think it was around '97 or '98.
7       Q    Okay.  And you worked at the CCD station for
8   the remainder of your tenure at FedEx?
9       A    Yes, after I transferred from VNY.
10      Q    All right.  I saw on some documents that your
11  father worked for FedEx; is that right?
12      A    That's right.
13      Q    Is he still employed by FedEx?
14      A    No.  He's deceased.
15      Q    I'm sorry to hear that.
16           What did he do for FedEx?  Do you remember?
17      A    Yes.  He was a courier first, and when he
18  passed, he was a dispatcher.
19      Q    All right.  So at the time he died, he was
20  employed by FedEx?
21      A    Yes.
22      Q    Ma'am, do you ever recall receiving any
23  employee handbooks while you worked at FedEx?
24      A    Yes.
25      Q    And do you recall having to sign handbook



ESQUIRE
an Alexander Gallo Company

LaMECIA McKENZIE                                    January 25, 2011

40

1    receipts?

2        A    Yes.

3        Q    Did you sign handbook receipts?

4        A    Yes.

5            (Exhibit 2 marked)

6    BY MR. BABCOCK:

7        Q    I'll hand you what's been marked as

8    Exhibit 2, which is a handbook receipt dated

9    10/22/1996.

10       A    Uh-huh.

11       Q    Ma'am, is that your handwriting at the

12   bottom?

13       A    Yes, it is.

14       Q    Is that your signature?

15       A    Yes, it is.

16       Q    And did you read this document before you

17   signed it?

18       A    I'm sure, yes, I did.

19       Q    To be fair, I mean, you obviously signed this

20   in 1996; right?

21       A    Yes.

22       Q    So my hunch is -- but I'll ask it anyway.

23            As you sit here today, ma'am, you don't

24   remember receiving this and reading it and signing it?

25       A    I remember us getting it every year before I



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

41

1    got to CCD, and that was something that they would

2    have us do in a meeting.  They would give us the books

3    for our monthly meetings.  We would read through it or

4    someone would read it aloud and read along, and then

5    we would sign it.

6            (Exhibit 3 marked)

7    BY MR. BABCOCK:

8        Q    That's marked as Exhibit 3, just another

9    employee handbook receipt dated October 28th, 2002.

10           Same questions, ma'am, is that your

11   handwriting on this document?

12       A    Yes.

13       Q    Is that your signature?

14       A    Yes.

15       Q    Did you read this document before you signed

16   it?

17       A    This one, I'll say no.

18       Q    This one you'd say you didn't read?

19       A    I did not read this one, no.

20       Q    Okay.  Why not?

21       A    This one was given -- and I remember clearly

22   because I was on my way leaving out of the building.

23   This is when I was a courier at CCD.  CCD -- I

24   remember -- was this CCD?  Yeah.  Yeah, I think I was

25   at, yeah, CCD.  I don't remember reading it.  I



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

LaMECIA McKENZIE                                    January 25, 2011

42

1    remember it being handed to me through the window of

2    my truck and told to sign it and then give it to the

3    manager and then read it later.

4        Q    Okay.  So you recall receiving the handbook

5    at this time?

6        A    Right.

7        Q    Okay.

8        A    But it wasn't the same procedure as before

9    where there was a meeting and you read it.

10       Q    Okay.  Fair enough.  And they asked you to

11   sign this document?

12       A    And then you give it.  It was a cardboard

13   thing inside of the flap of the handbook.  You sign

14   it.  You give that -- tear it out, give it to the

15   manager, and you keep the book.

16       Q    Okay.  Did you ever look at that employee

17   handbook?

18       A    Yes.

19       Q    Okay.  So to be clear, while you read the

20   employee handbook at some point after you received

21   it --

22       A    Uh-huh.

23       Q    -- you didn't read this document before you

24   signed the card?

25       A    Right.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

LaMECIA McKENZIE                                    January 25, 2011

51

1   fighting for your job if you were terminated.

2       Q    All right.  Have you ever heard of the term

3   "open door"?

4       A    Yes.

5       Q    Did you ever utilize the open door process

6   when you worked at FedEx?

7       A    If I had a problem with something that was

8   going on the road, I could talk to my manager about

9   it.  If that's what you mean, yes.

10      Q    What do you understand the open door process

11  was at FedEx?

12      A    That if we had any issues, that we would be

13  able -- we should be able to go to management

14  comfortably and discuss whatever the problem was.

15      Q    If you did not like what your manager had to

16  say, could you elevate that concern?

17      A    Yes.  You could go to his boss, which was the

18  senior manager.

19      Q    Okay.  Did you ever do that?

20      A    Just for -- no.  Just toward the end when the

21  termination GFT period, but prior to that, no.

22      Q    Okay.  When you worked at the CCD station,

23  ma'am, so from 1997, '98 through the end of your

24  tenure --

25      A    Uh-huh.



ESQUIRE
an Alexander Gallo Company

LaMECIA McKENZIE                                    January 25, 2011

52

1      Q    -- do you recall how your schedule was
2    determined?
3      A    The managers figured out the schedules.
4      Q    Okay.  How would they let you, as a courier,
5    know what your schedule would be?  Do you remember?
6      A    It would be posted.  Our schedules were
7    posted.  So we could look at the schedule once a week
8    or every day because they kept them up for the week to
9    see where -- you know, what your schedule, your start
10   and end time was.
11     Q    Okay.  So there was a weekly schedule posted?
12     A    Yes.
13     Q    Was it just for that week, or did they also
14   post the next week up there as well?
15     A    It was the -- yes, the week of and then the
16   week coming.  But the week coming came in the middle
17   of the week.  Like on a Wednesday, they had put up the
18   schedule for the next week.
19     Q    Okay.  And we need to break it up because you
20   were at CCD for close to ten years; right?
21     A    I was there some time, yeah.
22     Q    Okay.
23     A    I think I was at VNY a littler longer than
24   CCD.  I think.
25     Q    All right.  So why don't -- do you recall how



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

LaMECIA McKENZIE                                    January 25, 2011

69

1   statement dated July 27th, 2009.

2       A   Yes.

3       Q   Ms. McKenzie, is this the handwritten

4   statement you provided to FedEx --

5       A   Yes.

6       Q   -- around the time of your suspension?

7       A   Yes.

8       Q   Is that your handwriting on both of these two

9   pages?

10      A   Yes.

11      Q   Is that your signature on the first page?

12      A   Yes.

13      Q   Do you know which came first?  Were you asked

14  to provide a written statement prior to being

15  suspended, or did you provide the written statement

16  after you were suspended?  Do you know?

17      A   I can't remember which order it came in.

18          (Exhibit 9 marked)

19  BY MR. BABCOCK:

20      Q   Okay.  I'll hand you what's been marked as

21  Exhibit No. 9, which is a July 30, 2009, interoffice

22  memorandum from Gregory Arnold to Ms. McKenzie.

23          Ma'am, did you receive this document?

24      A   Yes.

25      Q   Is that your signature on page 2?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

LaMECIA McKENZIE                                    January 25, 2011

70

1      A    Yes.

2      Q    And on the bottom of page 2, it references

3   some enclosures, an acceptable conduct policy,

4   performance improvement policy, and GFT bubble sheet.

5           Do you see that?

6      A    Yes.

7      Q    Do you recall receiving those policies?

8      A    After or during the suspension, yes.

9      Q    Okay.  And those were a couple of the

10  policies you could find in the People Manual; is that

11  right?

12     A    Yes.

13     Q    This was your termination letter; correct,

14  ma'am?

15     A    Yes.

16     Q    All right.  And it talks about the GFT

17  process here; correct?

18     A    Yes.

19     Q    And did you, in fact, GFT or enter the GFT

20  process after you were terminated by FedEx?

21     A    Yes.

22          (Exhibit 10 marked)

23  BY MR. BABCOCK:

24     Q    I'll hand you what's been marked as

25  Exhibit 10, which is a handwritten statement.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

LaMECIA McKENZIE                          January 25, 2011

71

1          Is this the statement you included with your

2    guaranteed fair treatment process or appeal of your

3    termination?

4        A    Yes.

5        Q    All right.  Is that your signature at the

6    bottom?

7        A    Yes.

8        Q    And is this your handwriting on this

9    document?

10       A    Yes.

11            (Exhibit 11 marked)

12   BY MR. BABCOCK:

13       Q    I'll hand you what's been marked as

14   Exhibit 11, which is a letter from Greg Arnold to

15   Ms. McKenzie, and it has in handwriting the term

16   "Management Rationale" and "Management Rationale

17   Continued" on the second page as well as some

18   handwritten page numbers on the bottom of 4 and 5.

19            Ma'am, do you recall receiving this letter

20   minus the handwriting on the document?

21       A    Honestly, I want to say I don't remember, but

22   that is not to say that I didn't because there was a

23   lot of paperwork.

24       Q    Fair enough.  Did you have an adequate time

25   to look at the contents --



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

LaMECIA McKENZIE                                    January 25, 2011

72

1       A    Yeah.

2       Q    -- of the document?

3       A    Yes.

4       Q    Okay.  And you just don't remember whether or

5   not you recall seeing this before?

6       A    Right.

7       Q    At some point after your termination after

8   you submitted your handwritten GFT materials to FedEx,

9   did you have a meeting with Kennedy Smith?

10      A    Yes.

11      Q    And who else was present at the meeting?  Do

12  you remember?

13      A    Kenny Smith, Chris Howard, Gregory Arnold,

14  Cynthia Lachica --

15      Q    Okay.

16      A    -- myself, and there was a stenographer in

17  the room or a guy taking -- yeah, he was taking notes,

18  Kenny's secretary.

19      Q    Okay.  Do you remember his name?

20      A    No.

21      Q    Was his name Robert Sunseri perhaps?

22      A    I don't remember.

23      Q    Okay.

24           (Exhibit 12 marked)

25  BY MR. BABCOCK:



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

LaMECIA McKENZIE                                    January 25, 2011

73

1       Q    I'll hand you what's been marked as

2   Exhibit 12, which is an August 20, 2009, letter from

3   Kenneth Smith to Ms. McKenzie.

4            Ms. McKenzie, do you recall receiving this

5   letter?

6       A    Yes.

7       Q    Okay.   And in this letter, it references that

8   you can proceed to Step 2 of the GFT process; is that

9   right?

10      A    Yes.

11      Q    And did you precede to Step 2 of the GFT

12  process?

13      A    Yes.

14           (Exhibit 13 marked)

15  BY MR. BABCOCK:

16      Q.   I'm going to hand you what's been marked as

17  Exhibit 13, which is a typewritten document, undated.

18  It's purportedly written by Ms. McKenzie.

19           Ma'am, have you seen this document before?

20      A    Yes.

21      Q    And did you type this document?

22      A    Yes.

23      Q    All right.   And is this what you submitted as

24  part of the Step 2 process of the GFT?

25      A    Yes.



ESQUIRE
an Alexander Gallo Company

LaMECIA McKENZIE                                    January 25, 2011

74

1        Q    All right.

2             (Exhibit 14 marked)

3    BY MR. BABCOCK:

4        Q    I'll hand you what's been marked as

5    Exhibit 14, which is an August 31st, 2009, letter from

6    a Glen Corbin to Ms. McKenzie.

7             Did you receive this document, ma'am?

8        A    Yes.

9        Q    Had you ever met Mr. Corbin?

10       A    Yes.

11       Q    And who is he?

12       A    Glen Corbin was the vice president.

13       Q    Okay.

14       A    He was Kenny Smith's boss, I believe.  Well,

15   obviously.

16       Q    Okay.  This document references that should

17   you desire, you have a right to proceed to Step 3 of

18   the GFT process; is that correct?

19       A    Yes.

20       Q    And did you proceed to Step 3?

21       A    Yes.

22       Q    And did you eventually learn that the appeals

23   board upheld your termination?

24       A    Yes.

25       Q    Ma'am, would it be fair to say that you were



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

LaMECIA McKENZIE                                    January 25, 2011

75

1    upset about being terminated from FedEx?

2        A    That I was upset?

3        Q    Yeah.

4        A    That I was, yes.

5        Q    Okay.  Did you bring these documents that we

6    just looked at, your statements and the various

7    letters telling you what happened during the GFT

8    process -- did you bring those documents to the first

9    meeting with your attorney?

10       A    Yes.

11       Q    Okay.  Did you seek out an attorney to

12   discuss your termination with FedEx?

13       A    Yes.

14       Q    Ma'am, the handwritten statements that you

15   provided to FedEx, which are Exhibit 8 and 10, and the

16   typed letter, which is 13 -- so you have those in

17   front of you; right?

18       A    Okay.

19       Q    Am I correct, ma'am, that none of these

20   exhibits mention the problem with your paychecks?

21       A    None of them do, as far as I know, no.

22       Q    Okay.  Ma'am, is it fair to say you never

23   thought there was a problem with your paychecks till

24   you met with your attorneys?

25            MR. HANSON:  Objection.  Misstates the prior



ESQUIRE
an Alexander Gallo Company

1      Q    Who was that attorney?  Do you remember his

2  or her name?

3      A    I remember his first name being John.  I

4  don't remember his last name.  He was on the Internet

5  and through that type of situation.  It wasn't someone

6  I had gone into an office to speak with.

7      Q    Okay.  Do you recall where John officed?

8      A    No.  It was through the Internet, so we were

9  communicating over the Internet.

10     Q    All right.  How did you learn about your

11 current counsel?

12     A    Same way, over the Internet.

13     Q    Okay.  A Google search or something?

14     A    Yeah, I did.  I searched wrongful termination

15 lawyers, and then it pulled up a list, and I was able

16 to choose and then do a little research and get some

17 background on the attorneys that were listed.

18     Q    All right.  So you did some research on

19 Mr. Jackson and Mr. Hanson before you called them?

20     A    Mr. Hanson.

21     Q    Okay.  Did you do any research on

22 Mr. Jackson?

23     A    No.

24     Q    Okay.  Ma'am, have you ever filed a charge of

25 discrimination against an employer?



# ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

LaMECIA McKENZIE                                    January 25, 2011

98

1    much I'm getting paid, my rate, how much my rate is in

2    overtime and how many hours am I supposed to be

3    getting paid for.

4         Q    Okay.  Were there other confusions under the

5    earnings section?

6         A    For this particular check, no.  That is the

7    most confusing part that has been since when I asked

8    the manager for.  That's why I asked him in the

9    beginning how do I know so I don't have to have this

10   conversation with you.  How do I know what I'm

11   supposed to be getting paid and how many hours I'm

12   supposed to get paid.  That's the only part that's

13   confusing for me.

14        Q    Okay.  So Mr. Arnold didn't tell you that you

15   look at the hours marked for overtime and that's how

16   many hours you got paid?

17        A    Because it looks like it's on here twice.

18        Q    Okay.  He didn't tell you to just look at one

19   of them?

20        A    No.

21        Q    Okay.  All right.  Did you discuss this

22   particular confusion with other -- anyone else at

23   FedEx?

24        A    No.

25        Q    Did you discuss any of the confusions that



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

LaMECIA McKENZIE                                    January 25, 2011

103

1      Q   All right.  And did you know in 2009, at the

2   end of March of 2009, that you were being paid --

3   excuse me -- $21.20 an hour?

4      A   Yes.

5      Q   Okay.  And you testified earlier that your

6   understanding since, I believe, your very first job is

7   overtime is paid at time and a half; is that right?

8      A   Yes.

9      Q   Okay.  Would you agree if you look at the

10  overtime premium line, which is the first line under

11  earnings, that 10.60 is half of 21.20?

12     A   10.60 is half of 21.20.

13     Q   Okay.  And you were entitled to be paid time

14  and a half for any overtime hours; correct?

15     A   Yes.

16     Q   So the overtime rate that you were entitled

17  to be paid on March 27th, 2009, was $31.80 an hour?

18     A   I can't answer that.  I would say, yes,

19  that's what it should be, but it doesn't clearly state

20  that on --

21     Q   Okay.

22     A   -- the paycheck stubs.

23     Q   I appreciate that, but you know in your mind

24  when back on March 27th, that your overtime rate of

25  pay --



ESQUIRE
an Alexander Gallo Company

LaMECIA McKENZIE                                     January 25, 2011

104

1          A    Should be.

2          Q    -- should be $31.80; is that right?

3          A    Yes.

4          Q    Okay.  So let me walk you through this

5    paycheck, okay, specifically the earnings part.

6               The third line down where it says regular

7    earnings, do you see that?

8          A    Yes.

9          Q    And you don't have any confusion that from

10   March 27th you were being paid for 40 hours of regular

11   earnings; correct?

12         A    Yes.

13         Q    So your confusion was the two lines above; is

14   that right?

15         A    Yes.

16         Q    All right.  And would you agree that what

17   this first line says is that FedEx is paying you

18   $10.60 an hour for 9.12 hours; is that right?

19              MR. HANSON:  Objection.  Calls for

20   speculation.

21   BY MR. BABCOCK:

22         Q    You can answer.

23         A    I would have to say I'm unsure because it

24   says premium.  For me, I thought that that was the

25   most that I could get.  It's not clear if that is



LaMECIA McKENZIE                                    January 25, 2011

106

1   yes.

2       Q   Does my -- does my questions or explanations

3   explain to you what this paycheck says?

4       A   Now it does, yes.

5       Q   Okay.

6           MR. HANSON:  I didn't get a question or how

7   you're explaining to her what's in that.  I wasn't

8   sure if you had a question actually pending.

9           MR. BABCOCK:  She answered the question.

10          Do you have an objection to form?

11          MR. HANSON:  Well, I wasn't sure about what

12  the question was.  I didn't hear a question.  In that

13  case, it will be a belated objection that it lacks

14  foundation and calls for speculation --

15          MR. BABCOCK:  Okay.

16          MR. HANSON:  -- to the extent she answered

17  the question.

18  BY MR. BABCOCK:

19      Q   So let me re-ask the question.

20      A   Okay.

21      Q   So I believe what I explained to you was

22  FedEx broke out your overtime pay into two lines, one

23  line showing you the regular rate of pay and one line

24  showing the premium or the extra 50 percent rate of

25  pay?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

LaMECIA McKENZIE                                    January 25, 2011

107

1       A    Yes.  You did explain that.

2       Q    Okay.  And so what this shows you is you're

3  being paid 9.12 hours at your regular rate and also

4  9.12 hours at your overtime premium rate?

5            MR. HANSON:  Objection.  Calls for

6  speculation and lacks foundation.

7            You can answer.

8            THE WITNESS:  No.  I mean, I see clearly here

9  what you're saying now that you are explaining it to

10  me, but again, it wasn't explained that way when I

11  initially had the issues with the pay period.

12  BY MR. BABCOCK:

13      Q    Okay.

14      A    So now that you have explained, yes, I can

15  see that.

16      Q    Okay.  And I'm not trying to trick you.

17      A    Okay.

18      Q    I think the record adequately shows you were

19  saying at the time you worked at FedEx, you didn't

20  understand that?

21      A    Yes.

22      Q    Okay.  I think you've said that several

23  different ways on several different occasions, and I

24  appreciate that.  I heard you when you said that.

25            And I also appreciate your testimony that now



ESQUIRE
an Alexander Gallo Company

108

1     that I have explained it to you, you understand it.

2         A    Yes.

3         Q    And so if Mr. Arnold would have explained it

4     to you a year before or whenever that time period took

5     place when you asked him the question about that one

6     check, you would have understood it them presumably;

7     right?

8              MR. HANSON:   Objection.   Calls for

9     speculation; lacks foundation.

10             THE WITNESS:   Yes.   If he had explained it to

11    me the way that you just did, then it would have been

12    more clear.

13             MR. BABCOCK:   We're on 17, ma'am?

14             THE REPORTER:   Yes.

15             (Exhibit 17 marked)

16    BY MR. BABCOCK:

17        Q    I'm going to hand you Exhibit 17.   I'll

18    represent to you, ma'am, this is another copy of one

19    of the paychecks.   I think it's page 2 of Exhibit 15;

20    okay?

21        A    Okay.

22        Q    I want to go through this paycheck with you.

23        A    Okay.

24        Q    Okay.   If I were to ask you, what does this

25    paycheck reflect, how many regular hours you worked



LaMECIA McKENZIE                                    January 25, 2011

109

1    for the week ending August 2, 2008, what would you

2    say?

3        A    If you were to ask me how many hours I

4    worked?

5        Q    Yeah.

6        A    35 and 53 minutes.

7        Q    35.53 hours?

8        A    Yes.

9        Q    And that's regular earnings; correct?

10       A    Yes.

11       Q    And you obviously worked -- this wage

12   statement reflects that you worked some overtime for

13   the previous week; correct?

14       A    Yes.

15       Q    Okay.  And now that I -- after our discussion

16   of Exhibit 16, if I were to ask you how many hours of

17   overtime does this wage statement reflect you working,

18   what would your answer be?

19       A    This wage statement looks as if I am earning

20   more than four hours overtime, when I believe it was

21   just two and a half hours.  That's part of the

22   confusion.

23            Now that you have explained it to me, I can

24   answer that my overtime was 2 hours and 28 minutes.

25       Q    Okay.  Now that I have explained it to you,



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

LaMECIA McKENZIE                                January 25, 2011

110

1    you understand that FedEx has listed what your rate of

2    pay -- your regular rate of pay and then also your

3    overtime premium rate of pay; correct?

4         A    In that section, yes, they did.

5         Q    And they broke it out into two.  Your

6    confusion was you didn't understand why it was broken

7    onto two; is that right?

8         A    Well, and then why it was broken down into

9    two, how was I supposed to add it up, was my overtime

10   paid the same as my regular earnings because they were

11   the same, and was the premium the max that I could get

12   or was that something that I should -- that was the

13   exact number I should have added into the 21.60.

14        Q    Okay.  But now sitting here this moment --

15        A    Now it's clear because of the way you have

16   explained it to me on that particular part, yes.

17        Q    Okay.  That's all of the questions I have for

18   now, but I'm sure I'll follow up after Mr. Hanson asks

19   you some questions; okay?

20        A    Okay.

21             MR. BABCOCK:  Mr. Hanson, do you want to

22   switch seats with me?

23             MR. HANSON:  No.  I can just do it from here.

24                          EXAMINATION

25   BY MR. HANSON:



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Complete the "bubble"sections, neatly darkening in the circles.

Employee Number         First Letter     Second Letter
                           of                of
                        Last Name        Last Name

*1  7  7  7  4  4*          *m*               *C*

**Employee:** Read carefully, complete the requested information, sign, and return this page to your manager so he may review it and forward it to the Personnel Information Control Center (PICC).

You should understand that *The Federal Express Employee Handbook* is not a contract of employment, nor should *The Federal Express Employee Handbook's* provisions be read or implied to provide for one. Your specific rights as an employee are governed by the Employment Agreement you signed in your employment application. For more specific guidelines, refer to the PEOPLE manual and *Your Employee Benefits* book. Official personnel policies, as found in the PEOPLE manual, are referenced throughout the Employee Handbook and in the index. Your manager will make the PEOPLE manual available to you upon request and answer any questions you may have about policies and procedures. The Company provides the Guaranteed Fair Treatment Procedure (GFTP/EEO Process) to resolve employment disputes and problems quickly. Employees are therefore expected to use the GFTP to resolve all work-related disputes.

*The Federal Express Employee Handbook* contains guidelines only and the Company can modify this publication by amending or terminating any policy, procedure, or employee benefit program at any time. The information in the 1996 *The Federal Express Employee Handbook* supersedes all information in previous editions to the extent it is inconsistent with this edition. All information in previous editions inconsistent with this edition is expressly revoked. No manager or representative of the Company, other than the CEO or a senior vice president designated by the CEO, has any authority to enter into any agreement modifying this publication in any way, or to enter into an agreement of employment with you for any specified period of time. Any amendment or agreement, if made, shall not be enforceable unless it is in writing and signed by you and the CEO or designated senior vice president. This publication applies to all employees except those employees whose terms and conditions of employment are governed by a collective bargaining agreement.

I have read and fully understand the statement on this page and have received a copy of *The Federal Express Employee Handbook* on *10/22/96*
(date received)

Name: *LaMerin McLenric*   Signature: *[signature]*
(Please Print)

Employee No.: *17774*      Date: *10/22/96*

HBR96          01

FedEx

WCG000100

Exhibit

*2*   *McKenzie*
         *1/25/11*

*M* ESQUIRE   *1/25*

Complete the "bubble" sections, neatly darkening in the circles.

| Employee Number | First Letter of Last Name | Second Letter of Last Name |
|---|---|---|
| 1 7 7 7 4 4 | M | C |

**Employee:** Read carefully, complete the requested information, sign, and return this page to your manager so that he may review it and forward it to the Human Resources Information Systems Center (HRIS).

The FedEx Express *Employee Handbook* is not a contract of employment, nor should its provisions be read or implied to provide for one. Your specific rights as an employee are governed by the Employment Agreement you signed in your employment application. For more specific guidelines, refer to the *PEOPLE Manual* and *Your Employee Benefits book* (YEB).

Official personnel policies, as found in the PEOPLE Manual are referenced throughout the Employee Handbook and in the index. Your manager will make the PEOPLE Manual available to you upon request and answer any questions you may have about policies and procedures. You may also access the PEOPLE Manual from the FedEx Intranet as discussed in the Resources Section of this handbook. The Company provides the Guaranteed Fair Treatment Procedures (GFTP/EEO Process) to resolve employment disputes and problems quickly. Employees are therefore expected to use the GFTP to resolve all eligible work-related disputes. The Open Door Process may be used to address other concerns.

The FedEx Express *Employee Handbook* contains guidelines only and the Company can modify this publication by amending or terminating any policy, procedure, or employee benefit program at any time. The information in this 2002 FedEx Express Employee Handbook supersedes all information in previous editions to the extent it is inconsistent with this edition. All information in previous editions inconsistent with this edition is expressly revoked. No manager or representative of the Company, other than the CEO or Senior Vice President designated by the CEO, has any authority to enter into any agreement modifying this publication in any way, or to enter into an agreement of employment with you for any specified period of time. Any amendment or agreement if made shall not be enforceable unless it is in writing and signed by you and the CEO or designated Senior Vice President. This publication applies to all employees except those whose terms and conditions of employment are governed by a collective bargaining agreement.

I have read and fully understand the statement on this page and have received a copy of *The FedEx Express Employee Handbook* on .10/28/02.



Name  LaMecia McKenzie       Signature
Empl. Prnt   17774       Date  10/28/02
Employee No

HBR02                          020101001

FedEx

2041730735  WCS

| | Exhibit |
|---|---|
| 3 | McKenzie 4/25/11 |
| | M ESQUIRE 1/9 |

Complete the "bubble" sections, neatly darkening in the circles.

## Employee Number

| 1 | 7 | 7 | 4 | 4 |
|---|---|---|---|---|

| First Letter of Last Name | Second Letter of Last Name |
|---|---|
| M | C |

### DISCLAIMER

FOR PERMANENT EMPLOYEES ONLY: READ CAREFULLY, COMPLETE THE REQUESTED INFORMATION, SIGN, AND RETURN THIS PAGE TO YOUR MANAGER.

MANAGER: RETAIN THE ORIGINAL HANDBOOK RECEIPT IN THE EMPLOYEE/STATION FILE. FAX OR COMAIL A COPY OF THE HANDBOOK RECEIPT TO HRMS FOR PERMANENT RETENTION. REFER TO THE REMOTE FAX PROGRAM INSTRUCTIONS AT:

*http://hrmslibrary.corp.fedex.com/hrisfax/*

THE *FEDEX EXPRESS EMPLOYEE HANDBOOK* IS NOT A CONTRACT OF EMPLOYMENT, NOR SHOULD ITS PROVISIONS BE READ OR IMPLIED TO PROVIDE FOR ONE. YOUR EMPLOYMENT WITH FEDEX, SPECIFIC RIGHTS AS AN EMPLOYEE ARE GOVERNED BY THE EMPLOYMENT AGREEMENT YOU SIGNED IN YOUR EMPLOYMENT APPLICATION. FOR MORE SPECIFIC GUIDELINES, REFER TO THE *PEOPLE MANUAL, YOUR EMPLOYEE BENEFITS BOOKLET(S), AND YOUR RETIREMENT BENEFITS BOOK (RBB).*

OFFICIAL PERSONNEL POLICIES, AS FOUND IN THE *PEOPLE MANUAL*, ARE REFERENCED THROUGHOUT THE FEDEX EXPRESS *EMPLOYEE HANDBOOK*. YOUR MANAGER WILL MAKE THE *PEOPLE MANUAL* AVAILABLE TO YOU UPON REQUEST AND ANSWER ANY QUESTIONS YOU MAY HAVE ABOUT POLICIES AND PROCEDURES. YOU MAY ALSO ACCESS THE *PEOPLE MANUAL* FROM THE FEDEX INTRANET AS DISCUSSED IN THE RESOURCES SECTION OF THIS HANDBOOK. THE COMPANY PROVIDES THE GUARANTEED FAIR TREATMENT PROCEDURE (GFTP/EEO PROCESS) TO RESOLVE EMPLOYMENT DISPUTES AND PROBLEMS QUICKLY. EMPLOYEES ARE THEREFORE EXPECTED TO USE THE GFTP TO RESOLVE ALL ELIGIBLE WORK-RELATED DISPUTES. THE OPEN DOOR PROCESS MAY BE USED TO ADDRESS OTHER CONCERNS.

THIS *FEDEX EXPRESS EMPLOYEE HANDBOOK* CONTAINS GUIDELINES ONLY AND THE COMPANY CAN MODIFY THIS PUBLICATION BY AMENDING OR TERMINATING ANY POLICY, PROCEDURE, OR EMPLOYEE BENEFIT PROGRAM AT ANYTIME. THE INFORMATION IN THE 2006 *FEDEX EXPRESS EMPLOYEE HANDBOOK* SUPERSEDES ALL INFORMATION IN PREVIOUS EDITION TO THE EXTENT IT IS INCONSISTENT WITH THIS EDITION. ALL INFORMATION IN PREVIOUS EDITIONS INCONSISTENT WITH THIS EDITION IS EXPRESSLY REVOKED. NO MANAGER OR REPRESENTATIVE OF THE COMPANY, OTHER THAN THE CEO OR SENIOR VICE PRESIDENT DESIGNATED BY THE CEO, HAS ANY AUTHORITY TO ENTER INTO ANY AGREEMENT MODIFYING THIS PUBLICATION IN ANY WAY, OR TO ENTER INTO AN AGREEMENT OF EMPLOYMENT WITH YOU FOR ANY SPECIFIED PERIOD OF TIME. ANY AMENDMENT OR AGREEMENT IF MADE SHALL NOT BE ENFORCEABLE UNLESS IT IS IN WRITING AND SIGNED BY YOU AND THE CEO OR DESIGNATED SENIOR VICE PRESIDENT. THIS PUBLICATION APPLIES TO ALL *PERMANENT EMPLOYEES* EXCEPT THOSE WHOSE TERMS AND CONDITIONS OF EMPLOYMENT ARE GOVERNED BY A COLLECTIVE BARGAINING AGREEMENT.

**FedEx**

2041732076  WCS

I have read and fully understand the statement on this page and have received a copy of *The FedEx Express Employee Handbook* on _____ 2/30 _____ (time received)

Name _LaMecia McKenzie_ (Signature) _____  Date: _3/3/07_
(Please Print)

Employee No.: _177744_

HBR06

060601001

**Exhibit**

4   McKenzie
1/26/11

ESQUIRE   1 pg

NOV. 18. 2008   8:41AM                                              NO. 6951   P. 4

CCDA
Ground Operations
3700 S. Robertson Blvd
Culver City, CA 90232

Telephone 310.204.2973
Fax 310 639.3287

**FedEx** ®
Express

Inter-Office Memorandum

Date:   September 5, 2008                    To:    Lamecia McKenzie #177744

From:   Gregory Arnold                       cc:    Christopher Howard
                                                    Timoty Wertner
                                                    Jackie Mendez-Solis
                                                    HRIS

RE:     *Performance Reminder – Attendance*

Lamecia, you have a total of 6 sick days & 3 unexcused absences over the last 12 month calendar year. You have exceeded our acceptable standard for unexcused absences which has affected your overall attendance rating. You have been notified per counseling of our attendance policy & must maintain acceptable attendance moving forward.  If you have another unexcused absence before 12/12/08, you will be issued a second performance reminder for failure to adhere to our attendance policy. If you call in sick before 11/12/08 you will be issued a second performance reminder for remaining below our acceptable rate per policy.  Listed below are your sick & unexcused absence dates:

- 11/12/07
- 12/12/07 (Unexcused Absence)
- 12/27/07 (Unexcused Absence)
- 1/2/08
- 1/28/08 (Unexcused Absence)
- 2/15/08
- 6/19/08
- 8/8/08
- 8/25/08

As a result, your attendance rating is now in jeopardy of falling below satisfactory (96.53) and in accordance with the Attendance Policy, P1-20; you are being placed in Performance Improvement and are being issued an Performance Reminder as a notification of deficiency.

# VERIFIED BY SL 11/19/2008

Exhibit

5  McKenzie
   1/25/11

ESQUIRE

5.

*Reminder Letter / Attendance*
Lamecia Mckenzie #177744
Cont'd.

"Three unsatisfactory performance reviews, three performance reminders, or a combination of any type of notification (including warning letters for misconduct), totaling three (normally within a twelve month period), usually results in termination.  Performance Reminders do not have to relate to a common deficiency in order for termination to occur."

Once again, I want to offer any assistance in helping you achieve the standards that apply to the entire workforce.  However I expect 100% commitment and effort from you and I know you will succeed.

Should you in good faith believe this action to be unfair, you have the right to proceed to Step 1 of the Guaranteed Fair Treatment Process. You must submit an electronic request within five (5) calendar days through the GFTP screen in PRISM. Timothy Werner (District Managing Director), your management, and Jackie Mendez-Solis (your personnel representative) receive this information. You will be notified regarding the meeting or conference call to address your concerns. Please feel free to discuss this with your Personnel Representative, Jackie Mendez-Solis, who can be reached at 213 741-2464.

To enter the GFTP process at Step 1, please follow the instructions in the attached pamphlet, which describes the on-line GFTP procedures.

Regards,

Gregory Arnold
Operations Manager
CCDA Station

_____                                    9/3/8
Employee Signature                                           Date

6.2

MAR. 20. 2009   3:43AM

CCDA
Ground Operations
3700 S. Robertson Blvd
Culver City , A 90232

NO. 7551   P. 2
Telephone 310.204.7973
Fax 310.839.3287


Express

**VERIFIED BY SL 3/19/2009**

INTER-OFFICE MEMORANDUM

DATE:   December 31, 2008

TO:   Lamecia McKenzie   177744

FROM:   Gregory Arnold
Employee #173262

cc:   Christopher Howard
Jackie Mendez Solis
Kenneth Smith
HRIS

RE:   PERFORMANCE REMINDER
SERIOUS TRAFFIC VIOLATION

Lamecia, after conducting an thorough investigation into the serious accident you were involved in on December 24, 2008. I am issuing you this performance reminder for violating our Vehicle Accidents/Occurrences (P8-90) policy. On December 24, 2008, you were involved in a "FedEx Serious/DOT Recordable Accident," which resulted in disabling damage requiring towing. You will also be required to take REDS class on January 9, 2009. You need to be aware that further instances of this nature will not be tolerated and may lend to more severe action, up through termination.

For the purposes of Career Opportunity and JCATS bids, this letter will remain active for twelve (6) months.  Please be aware of the following as stated in People 2-50, Performance Improvement:

As a result of this second Performance Reminder, you will be granted a decision day on Friday, January 2, 2009. A day of decision is a day off, with pay, to decide whether or not you wish to remain employed by Federal Express. You are to return on Monday January 5, 2009 with either a detailed personal Performance Agreement or a letter of resignation.

"Three unsatisfactory performance reviews, three performance reminders, or a combination of any type of notification (including warning letters for misconduct), totaling three (normally within a 12-month period), normally result in termination. Performance reminders do not have to relate to a common deficiency in order for termination to occur."

Should you in good faith believe this action to be unfair, you have the right to proceed to Step 1 of the Guaranteed Fair Treatment Procedure.  You must submit your electronic request within 5 calendar days through the GFTP screen in PRISM. The District Managing Director, your management, and Human Resources will receive this information.  You will be notified regarding the meeting or conference call to address your concerns.  Please feel free to discuss this with your Human Resources Rep, Jackie Mendez Solis at 213 741-2464.

Sincerely,

Gregory Arnold
Operations Manger CCDA

Signing this document does not indicate that you agree with its contents,  It merely indicates that the contents have been discussed with you and that you have received a copy of the document.

| | | |
|---|---|---|
| Employee Signature | 177744 Employee Number | 1/5/2009 Date |
| Witness Signature | Employee Number | Date |

Exhibit
6 McKenzie 1/25/11
ESQUIRE

IA
...nd Operations
3760 S. Robertson Blvd.
Culver City, CA 90232

Telephone 310.204.2973
Fax 310.839.3287


Express

Inter-Office Memorandum

Date:    July, 23, 2009                              To:  Lamecia McKenzie #177744
From:    Gregory Arnold

RE:      Letter of Suspension


Lamecia, as of Thursday July 23, 2009 you are being placed on paid suspension pending an investigation of violating (P2-5) Acceptable Conduct policy.

Please understand that this suspension is not punitive in nature.

While on investigatory suspension, you are not to contact any Fed Ex Express customer nor are you to enter any Fed Ex Express facility without permission of management.

Please stay in town and accessible by phone during normal operation hours. Call me daily at 0900. If I am unavalailable at the time of your call, you may speak to any other member of management.

If you have any questions regarding this suspension, please call your Personnel Representative, Cynthia Lachica at (310) 263-4657



Sincerely,

Gregory Arnold
Operations Manager
CCDA Station


Exhibit

7   McKenzie
     1/25/0
TWO ESQUIRE 1 P5

AUG. 1. 2009  9:23AM

CCDA
Ground Operations
3700 S Robertson Blvd
Culver City CA 0C232

NO. 8169   P. 2

Telephone 310.204.2973
Fax 310.839.3287



Express

## INTER-OFFICE MEMORANDUM

DATE:  July 30, 2009

FROM:  Gregory Arnold #173262

RE:  WARNING LETTER – FAILURE TO PROPERLY
REPORT AN ACCIDENT / TERMINATION –
3RD LETTER IN 12 MONTH PERIOD

TO:  Lamecia Mckenzie #177744

cc:  Christopher Howard
Kenny Smith
Cynthia Lachica
HRIS

On July. 20, 2009, you were involved in an accident and failed to report the incident to management properly.

FedEx is committed to the safe, proper, and professional operation of all road-licensed vehicles used to conduct company business. The Operator of a vehicle being used to conduct Company business must report any incident of a vehicle coming in contact with an object, property or person to a member of Management by telephone, if available, or by radio immediately. The employee must complete the Driver's Accident/Occurrence Packet at the scene, and the driver is not to leave the scene without Management's approval. Failure to report an accident/occurrence immediately, and hit/run or leaving the scene, are both serious violations of safety regulations.

This is your third discipline letter within a 12-month period. You have also received the following letters, December 31, 2008 for Serious Traffic Accident and September 5, 2008 for Attendance.

According to the performance improvement policy P2-50, three letters within a 12-month period normally results in termination. Therefore, your employment with FedEx is terminated effective July 30, 2009.

Should you in good faith believe this action is unfair, you have the right to enter the Guaranteed Fair Treatment Procedure/EEO Complaint Process. You must submit the enclosed bubble form within five (5) calendar days of receipt of this letter. Send the original document, including the bubble page and any additional documents, in a large envelop (do not fold the form) to:

FedEx Express Corporation
HRIS/GFTP
3975 Airways, 2nd Floor, Module E
Memphis, TN 38116

The information on these documents will be scanned into the GFTP system and electronic notifications will be sent to appropriate levels of management and Human Resources. You will be notified regarding the meeting or conference call to address your concerns. Employees who wish to initiate a complaint are encouraged to hold an open and frank discussion with their manager prior to initiating the process.

Should you have any questions about this issue or the GFTP process, please feel free to contact your matrix HR Representative Cynthia Lachica, who can be reached at 310 243-4657

9.1

Exhibit

9 McKenzie
1/25/11

M@ ESQUIRE 2.P3

AUG. 1. 2009  9:24AM                                              NO. 8169   P.  3

Page 2 #177744
Lamecia McKenzie/Warning Letter/Termination

Sincerely,

Gregory Arnold
Operations Manager
CCDA Station Operations

Signing this document does not indicate that you agree with its contents.  It merely indicates that the contents have been discussed with you and that you have received a copy of the document.

_____          _____
Employee                                       Date   7/30/9

_____          _____
Witness Signature                              Date
(If applicable)

ENCLOSED:
P2-5    Acceptable Conduct Policy
P2-50   Performance Improvement
GFTP Bubble Sheet

9.2

08/04/2009 4:20:16 PM -0500 ORION          PAGE 3   OF 6

*Complainant Statement*

1. Explain why you feel management was unfair.

I feel the decision made by management was unfair because management failed and in some cases prevented acquisition of policy manuals. Specific procedures such as textbook recommendation for appropriate actions were completely unknown to employees.

Information hoarding is a method of exerting pressure and influence by management giving them more power to discipline employees suddenly and without employee knowledge. I was as a result of this management philosophy unaware a verbal as well as a written report needed to be filed in this kind of incident. Had the manual been made available to me, I would have absolutely taken the appropriate actions.

Lack of manual also kept me from knowing that in the case of a head on collision I (the driver) am supposed to let another driver hit me, rather than avoid the accident without causing greater or equal amounts of injury in the process. I understand that FedEx realizes that accidents have increasing levels of severity. I and my incident was the lowest level possible. It defies logic to encourage employees to take actions (allow accidents to occur) that will only result in more potential costs and liabilities. Perhaps the manual should be assigned to each employee and perhaps actions to preserve life should be recommended in those manuals. This would guarantee each employee is aware of protocol and would protect employees from undue management malfeasance.

Most importantly, it is unreasonable to dismiss a dependable, honorable hard-working employee after 17 years of service on some of Southern California's most challenging routes. Based on a situation where actual fault is unclear and station management's actions have disenfranchised me, is a situation that should be resolved through negotiation and reconciliation. I should be conditionally reinstated for a probationary period of the now 2 months remaining before my previous citations clears. Provided I complete the 2 months incident free, complete Defensive Driving IT training and an O/C check as to document incident I should be completely reinstated. In conclusion, please know that I take pride in being a FedEx employee and have enjoyed my 17 years with this company. I ensure you if given an opportunity to resume my employment with FedEx I will continue to give my best in providing excellent customer service, a safer and more knowledgeable working environment. Thank you,

③

Exhibit
10   McKenzie
1/25/11
ESQUIRE   109

CCDA
Ground Operations
3700 S. Robertson Blvd.
Culver City, CA 90232

Telephone 310.204.2973
Fax 310.839.3287

*Mgmt Rationale.*

08/05/2009
FedEx.
Express
Lamecia Y. McKenzie, 177744
10335 HAAS AVENUE
LOS ANGELES, CA 900470000

Dear Lamecia Y. McKenzie:

Below is the management rationale I provided to my Managing Director, Kenneth B. Smith regarding your Termination.  I have omitted any reference to specific employee names.

**NOTE:**  You are referred to as 'Complainant' in this document.

**Management Decision Rationale:**
On Monday July 20, 2009 the Complainant was involved in an accident at 1430 in the 300 to 400 block of Beverly Drive & Canon Drive. Complainant did not report accident to a member of management before they left the scene.

Complainant continued on with route assignment and returned to CCDA at 1805 and did not complete vehicle accident report or notify a member of management for a second opportunity.

Complainant did not contact direct manager or attempt to contact CCDA station the next day which is regular day off for third opportunity to address accident on July, 20, 2009.

On Wednesday July 22, 2009 Complainants direct manager was notified that vehicle maintenance requested a vehicle accident report for vehicle 232430. Complainant completed VIR book for the day and noted damage to vehicle.

Complainant reported to work at 0702 July 22, 2009 and did not report accident from July 20, 2009 for the fourth oppurtunity.Direct manager confronted Complainant about accident and then Complainant explained she hit a fixed object attempting to avoid a vehicle going the wrong direction in a one way alley.

The Complainant has been involved in six accidents and five were preventable. Complainant is aware of accident reporting policy and failed to properly report accident on July 20, 2009

(4)

Exhibit
11   McKenzie 1/25/u
ESQUIRE 2pg

11.1

*Mgmt Rationale con't*

Complainant's actions warranted a letter for violation of the Acceptable Conduct policy P2-5, specifically for not properly reporting an accident.This would be Complainant's third letter which warrants termination per policy P2-50 Performance Improvement.

Any additional questions or concerns that you may have can be addressed during the Step 1 GFTP meeting scheduled on 8/12/2009.

Regards,

Gregory V. Arnold
Mgr Station Ops/CDL
cc:     Cynthia A. Lachica
        File

⑤

11.2

Kenneth B. Smith
Managing Director
Los Angeles Empire District

Domestic Ground Operations
2601 Main Street
11th Floor
Irvine, CA 92614

Telephone 949.862.4650
Fax 949.862.4655
kbsmith@fedex.com

*Step 1 Response*

 **Express**

VIA FEDERAL EXPRESS OVERNIGHT LETTER
AIRBILL NO. 796878285926



August 20, 2009

Lamecia Y. McKenzie
10335 Haas Ave
Los Angeles, CA 90047

RE: GFTP STEP I RESPONSE - Updated

Dear Lamecia:

At your request, a GFTP Step 1 meeting was held on August 12th, 2009, at the CCDA Station. In attendance with me for your meeting were Christopher Howard, Senior Manager, Greg Arnold, Cynthia Lachica, Human Resources Representative, and Robert Sunseri, District Administration Manager.

After a thorough review of the facts and circumstances and the information from our meeting, it is my decision to uphold management's decision.

Lamecia, you are responsible for reporting damage sustained to FedEx vehicles. It is imperative that all damage, and discovered damage be reported to management as soon as possible. This early reporting enables determination of the damage occurrence, and if there were any other parties involved, which may require additional investigation. Reporting the incident on the vehicles VIR Book is insufficient notification.

Lamecia, please be aware three (3) occurrences of Performance Reminders/Warning Letters, within a (12) month period, generally result in termination. Your 3rd letter resulted from your failure to properly notify management of an incident/accident which resulted in damage to a FedEx vehicle.

Should you in good faith believe this action to be unfair, you have the right to proceed to Step II of the Guaranteed Fair Treatment Process by submitting the attached bubble form within five (5) calendar days of receipt of this notice. THE FORM MUST BE RECEIVED AT THE ADDRESS INDICATED BELOW ON OR BEFORE DAY FIVE (5). Send the original document, including the bubble page and any additional documents in a large envelope (form should not be folded) to:

FedEx Express Corporation
3975 Airways, 2nd floor,
Module E, HRIS-GFTP
Memphis, TN 38116.

(6)

**Exhibit**

12   McKenzie
      1/25/11

Mw ESQUIRE 2pgs

12.1

*Step 1 con't*

Lamecia Y. McKenzie
August 20, 2009
Page 2

Please follow the instructions on the enclosed Step II bubble form, which describes the GFTP procedures. This information will be received by Glen M. Corbin, and Human Resources.  You will receive a joint response from Mr. Corbin and Human Resources within ten (10) days.

Sincerely,

Kenneth Smith
Managing Director
Los Angeles Empire District

KS/rs

Enclosure: GFTP Step II Bubble Form

cc:    Christopher Howard
       Greg Arnold
       Cynthia Lachica

⑦

12.2

Dear Sir or Madam,

Thank you for allowing me this opportunity to speak directly to your heart. Some situations cannot be placed neatly into a category; they require a more substantial look into the circumstances. I humbly request that you would take into consideration the particular nature of this circumstance, where I pray you would agree that management's confession to a breach of their responsibility directly led to an error by an employee, me. It was at the first GFT meeting in this process that, Greg, my manager, admitted that prior to my incident and written discipline; employees were unaware of and had no access to training and protocol manuals. Only afterward did they correct their actions and make the manuals accessible to the employees. The record of the meeting reflects this. The specific procedures such as textbook recommendations for appropriate actions were completely inaccessible to me, the employee. I was, as a result, unaware that a verbal as well as a written report needed to be filed for this type of incident. Had the manual been made available to me, I would have absolutely taken the proper, company-approved actions.

Through the course of this process, I have come to know and thoroughly understand the specific procedures associated with any and all incidents or accidents and the reporting of them. Although I know that ignorance of a rule is no excuse for breaking it, I sincerely felt that I was pursuing the correct line of actions when I, in good faith, mistakenly broke protocol and failed to report the incident correctly. I understand that FedEx realizes that accidents have escalating levels of severity and, factually speaking, the incident I was involved in was managed by me to be the lowest level of severity possible. Please understand that as a loyal and excellent employee for over 17 years, I have consistently performed well in some of the most demanding areas, first in Encino, then in Beverly Hills. It was in Beverly Hills that a reckless driver attempted to place both the company and me at risk. With the opposing vehicle rapidly approaching and only moments to spare, I was forced into a quick decision. Being unaware of protocol, I made a best-guess judgment and evaded the collision to avoid the possibility of serious injury to the other driver or myself. In my sincere effort to preserve an injury-free incident, my effort to re-direct my vehicle into an open parking area was unfortunately not successful enough. The slight injury to my truck, which exactly met the limit at $500, was consistent with my legal 10 mph speed. I had, based upon previous experiences of others, believed at the time that I had taken all of the appropriate actions. With no phone of my own and finding local attitudes to be unenthusiastic toward allowing me to use theirs, I had no reliable means of communication to report the incident. I quickly inspected my truck, and determined that I was able to complete the day's delivery duties. Upon returning to the station, I, not realizing the extent of the damage, and simply reported the incident on the VIR sheet. I have, as I stated before, come to understand that I was to make management more fully aware though direct action. I offer this narrative not to excuse my behavior, but rather to reassure that I was not seeking to shirk my responsibilities, but in fact mistakenly believed that I was doing what was responsible.

If you look at my extensive, seventeen-year career with FedEx, you will see that errors such as this are not in any way reflective of my dedication to both the company and job responsibility. I am a tenacious employee, one who has never had a blemish on her license, or accumulated a number of infractions. Had I known the protocol, I would have followed it and not been subject to termination. This incident did not necessitate termination, and I remain confident that If given an opportunity to repair and resume my career following perhaps a defensive driving review and an OLCCACK as to document the incident, that I could complete any probationary period incident-free and be readily welcomed back to the fold with open arms. This position and my career have always meant a great deal to me, and I have always gone above and beyond my duty for whatever was necessary for the company to succeed. I have worked for FedEx for my entire adult life, and been a respected and appreciated member of the team wherever I have worked. I love my job and I am good at it. In fact, FedEx is a generational occupation for my family; My Dad was a beloved courier and dispatcher for FedEx as well. Please consider the terrible economic state of the country and the difficult prospects for job seekers, and be compassionate for a humble and hard-working employee who has dedicated all of her life to the company and its principles. Working for FedEx is all I have wanted to do, and all of my future plans are based around me doing a job that I love. Sometimes in life we all need someone to open their hearts and give us a second chance. I pray you will help me make now one of those times. Thank you for your kind focus and attention.

Sincerely,
LaMecia Mckenzie



Glen M. Corbin
Vice President
Western Region

U.S. Operations
2601 Main Street
11th Floor
Irvine, CA 92614
Telephone 949.892.4711

*Step 2 Response*

**FedEx.**
Express



**VIA FEDEX OVERNIGHT**

August 31, 2009

Lamecia McKenzie, 177744
10335 Haas Ave
Los Angeles, CA 90047
323-920-6295

Re:  STEP II GFTP

Lamecia,
The Guaranteed Fair Treatment Procedure (GFTP), outlined in People Policy 5-5, provides
Officer Review at Step 2 in the GFTP process.  A thorough review of your GFTP complaint has
been completed.  After reviewing all of the facts of your case I have decided to uphold
management's decision to terminate your employment.

Lamecia, you are aware that FedEx requires a high degree of integrity from all of its employees.
A review of the facts regarding an occurrence on July 20, 2009, indicates that you failed to notify
a member of FedEx management or file an Accident Report.  Failure to report an accident or
occurrence is a serious violation of the Vehicle Accidents/Occurrences Policy (P8-90), and could
expose the Company to extensive liability.  I find that the Warning Letter you were issued, as well
as the resultant termination for three active letters of performance deficiency in a twelve month
period, to be both warranted and appropriate.

Should you in good faith believe this action to be unfair you have the right to proceed to the next
step of the Guaranteed Fair Treatment Procedure, which is the Appeals Board by submitting the
attached bubble form within five (5) calendar days of receipt of this notice. THE FORM MUST BE
RECEIVED AT THE ADDRESS INDICATED BELOW ON OR BEFORE DAY FIVE (5).  Send the
original document, including the bubble page and any additional documents in a large envelope
(form should not be folded) to:

Federal Express Corporation
HRIS/GFTP
3975 Airways, 2nd Floor, Module E
Memphis, TN  38116

The information on these documents will be scanned into the GFTP system and you will be
notified regarding the decision of the Appeals Board as soon as possible.

Regards,

Glen Corbin
Vice President
Western Region

cc:  Matthew Thornton          Kenneth Smith
      Employee Relations        Christopher Howard
      Laura Corodimas

**Exhibit**

14  McKenzie
    1/25/11

ESQUIRE 1P9

0000177744          026468-026110
900340000 1013280E05

# Earnings Statement



**Federal Express Corporation**
3875 Airways, H/I West
U.S. Payroll Services
Memphis, TN 38116

Period Ending:        03/21/2009
Advice Date:          03/27/2009
Advice Number:        0033283872
Batch Number:         DCL002007737

Page 001 of 001



LAMECIA Y. MCKENZIE
-----------------------------------
Delivering on the Purple Promise
makes this check possible.

Exemptions    Addl Amt   Addl %
Fed: S-00
CA:  S-01

| Earnings | rate | hours | this period | year-to-date |
|---|---|---|---|---|
| OvrtimePrm | 10.600 | 9.12 | 96.67 | 673.42 |
| Overtime | 21.200 | 9.12 | 193.34 | 1493.75 |
| Reg Earn | 21.200 | 40.00 | 848.00 | 9069.36 |
| ExcessLife # | | | 5.49 | 16.47 |
| Vacation | | | | 536.00 |
| DbltimePrm | | | | 146.92 |
| FltgHolidy | | | | 169.60 |
| Alt Lunch | | | | 42.40 |
| Holiday | | | | 339.20 |
| Suspension | | | | 169.60 |
| | | | | |
| Gross Pay | | | 1138.01 | 12740.25 |
| Fed Tax Wages | | | 1130.25 | 12205.82 |

\# Non Cash Earnings & Benefits
\* Excluded from Taxable Wages

| | this period | year-to-date |
|---|---|---|
| TOTAL GROSS | 1138.01 | 12740.25 |
| TOTAL TAXES | 340.27 | 3495.81 |
| TOTAL DEDUCTIONS | 42.09 | 1301.03 |
| NET PAY | 755.65 | 7943.41 |

| Taxes | this period | year-to-date |
|---|---|---|
| Fed Withholding | 189.14 | 1927.91 |
| Fed MED/EE | 16.39 | 182.69 |
| Fed OASDI/EE | 70.08 | 781.14 |
| CA Withholding | 52.29 | 465.66 |
| CA SDI FTDI | 12.37 | 138.41 |
| Total Taxes | 340.27 | 3495.81 |

| Deductions | this period | year-to-date |
|---|---|---|
| *CA POS Ins | 11.25 | 134.00 |
| *DENTAL | 1.50 | 17.75 |
| *VISION | 0.50 | 6.00 |
| *401KPreTax | | 393.15 |
| MetPay | 28.84 | 484.12 |
| 401k Loan | | 187.38 |
| AftTaxSav | | 78.63 |
| Total Deductions | 42.09 | 1301.03 |

Other Information

©1998, 2006. ADP, Inc. All Rights Reserved.

◄ TEAR HERE

VERIFY DOCUMENT AUTHENTICITY - COLORED AREA MUST CHANGE IN TONE GRADUALLY AND EVENLY FROM DARK AT TOP TO LIGHTER AT BOTTOM

**Federal Express Corporation**
3875 Airways, H/I West
U.S. Payroll Services
Memphis, TN 38116

Advice Number:   D033283872
Advice Date:     03/27/2009
0000177744

THIS IS NOT A CHECK

| Deposited to the account of | Account Number | Amount |
|---|---|---|
| LAMECIA Y. MCKENZIE | XXXXXX1632 | 755.65 |

## NON-NEGOTIABLE

# Earnings Statement

0000177744
900340000 1013280E05

027909-027006

**FedEx.**
F ss

*Federal Express Corporation*
*3875 Airways, H/I West*
*U.S. Payroll Services*
*Memphis, TN 38116*

| | Page 001 of 001 |
|---|---|
| Period Ending: | 08/02/2008 |
| Advice Date: | 08/08/2008 |
| Advice Number: | 0030861058 |
| Batch Number: | DCL002007577 |

**LAMECIA Y. MCKENZIE**
----------------------------------------
Delivering on the Purple Promise
makes this check possible.



Exhibit 17 McKenzie 1/25/11 PW-E ESQUIRE Les

Exemptions   Addl Amt  Addl %
Fed:  S-00
CA:   S-01

| Earnings | rate | hours | this period | year-to-date |
|---|---|---|---|---|
| OvrtimePrm | 10.60 | 2.28 | 24.17 | 2454.14 |
| Overtime | 21.20 | 2.28 | 48.34 | 5484.64 |
| Reg Earn | 21.20 | 35.53 | 753.24 | 21939.16 |
| Pers Bus | | | | 339.20 |
| ExcessLife # | | | | 32.96 |
| Holiday | | | | 501.04 |
| SplShftOVT | | | | 3.99 |
| Splt Shift | | | | 49.41 |
| Vacation | | | | 1696.00 |
| DbltimePrm | | | | 576.41 |
| RetroReg | | | | 106.00 |
| Sick Pay | | | | 212.00 |
| SplShftDBT | | | | 1.18 |
| Alt Lunch | | | | |
| Retro OT | | | | 71.28 |
| 3rd shift | | | | 1.67 |
| 3rdShftOVT | | | | 0.11 |
| PrplPromPP | | | | 52.00 |
| | | | | |
| Gross Pay | | | 825.75 | 33488.23 |
| Fed Tax Wages | | | 813.75 | 32348.34 |

\# Non Cash Earnings & Benefits
\* Excluded from Taxable Wages

| | this period | year-to-date |
|---|---|---|
| TOTAL GROSS | 825.75 | 33488.23 |
| TOTAL TAXES | 218.77 | 9757.87 |
| TOTAL DEDUCTIONS | 75.27 | 5140.85 |
| NET PAY | 531.71 | 18589.51 |

| Taxes | this period | year-to-date |
|---|---|---|
| Fed Withholdng | 123.13 | 5532.52 |
| Fed MED/EE | 11.80 | 480.84 |
| Fed OASDI/EE | 50.45 | 2055.99 |
| CA Withholdng | 26.88 | 1423.49 |
| CA SDI FTDI | 6.51 | 265.03 |
| Total Taxes | 218.77 | 9757.87 |

| Deductions | this period | year-to-date |
|---|---|---|
| *CA POS Ins | 10.25 | 307.50 |
| *DENTAL | 1.25 | 37.50 |
| *VISION | 0.50 | 15.00 |
| *401KPreTax | | 812.85 |
| MetPay | 32.04 | 961.56 |
| 401k Loan | 31.23 | 312.30 |
| AftTaxSav | | 162.56 |
| CredtAssoc | | 200.00 |
| Garn - Writ | | 2331.58 |
| Total Deductions | 75.27 | 5140.85 |

Other Information

©1998, 2006. ADP, Inc. All Rights Reserved.

◄ TEAR HERE

©2002 Automatic Data Processing (PCSUV0)
VERIFY DOCUMENT AUTHENTICITY - COLORED AREA MUST CHANGE IN TONE GRADUALLY AND EVENLY FROM DARK AT TOP TO LIGHTER AT BOTTOM

**FedEx.**
Express

*Federal Express Corporation*
*3875 Airways, H/I West*
*U.S. Payroll Services*
*Memphis, TN 38116*

| Advice Number | 0030861058 |
|---|---|
| Advice Date: | 08/08/2008 |
| 0000177744 | |

VOID   THIS IS NOT A CHECK   VOID

| Deposited to the account of | Account Number | Amount |
|---|---|---|
| LAMECIA Y. MCKENZIE | XXXXXX1632 | 531.71 |

**NON-NEGOTIABLE**